**IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA**

**FILED**
**September 30, 2025**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**JOSHUA A.,**
**Petitioner Below, Petitioner**

**v.)  No. 25-ICA-5**    (Fam. Ct. Monongalia Cnty. Case No. FC-31-2024-D-179)

**JESSICA A.,**
**Respondent Below, Respondent**

### MEMORANDUM DECISION

 Petitioner Joshua A. ("Father")[1] appeals the Family Court of Monongalia County's December 10, 2024, order that denied his petition to modify custody of the parties' child. Respondent Jessica A. ("Mother") filed a response in support of the family court's order.[2] Father filed a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the family court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

The parties were never married and are the parents of one child. The parties met in January of 2018, in Maryland, where they both lived at the time. Their brief romantic relationship resulted in the birth of their only child in December of 2018, and by February of 2019, Mother asked Father to leave the home they shared. They reconciled for a short time, but soon thereafter, Mother and child started spending significant time in West Virginia without Father.

On May 3, 2019, Mother filed a petition in the District Court of Montgomery County, Maryland ("District Court") related to an altercation between the parties that

---

[1] To protect the confidentiality of the juvenile involved in this case, we refer to the parties' last name by the first initial. *See, e.g.*, W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Father is self-represented. Mother is represented by Larry W. Chafin, Esq., and Debra V. Chafin, Esq.

occurred on May 2, 2019.[3] On May 20, 2019, the District Court conducted an evidentiary hearing and subsequently entered a final protective order for Mother against Father. That order concluded there was a preponderance of evidence that Father had committed acts of abuse against Mother. The order found Father had "grabbed the mother, pushed her, restrained her, ripped son from her arms and took him from her." The protective order awarded custody of the child to Mother and directed that Father have supervised visits with the child every Saturday at the Safe Passage Center. The protective order was to remain in place for one year until May 20, 2020. However, Father subsequently appealed the District Court's May 20, 2019, order. A de novo hearing on the appeal was scheduled in the Circuit Court of Montgomery County, Maryland ("Maryland Circuit Court") for September 6, 2019. However, it appears that the parties executed a custody agreement during that hearing, which was adopted by the Circuit Court by order entered September 6, 2019.

The parties' custody agreement awarded primary custodial responsibility to Mother. Father's custodial time was to gradually expand over the next few months, and beginning January 16, 2020, Father was to have the child every other week from Thursday at 4:30 p.m. until Sunday at 5:00 p.m. The agreement also contained a holiday schedule and a provision for each party to have two nonconsecutive weeks of vacation time with the child in the summers. The agreement further stated that custody exchanges would occur in Hancock, Maryland, and recognized that Mother intended to relocate with the child to West Virginia in October of 2019, while Father remained in Montgomery County, Maryland.

The parties' September 6, 2019, agreement also included the entry of a consent protective order superseding the District Court's May 20, 2019, protective order. The consent protective order provided, "[t]hat the parties hereby enter into a consent protective order without any finding of fault or abuse by [Father] as against [Mother] or the minor child[.]" The order directed, "[t]hat [Father] shall not contact, attempt to contact, or harass (in person, by telephone, in writing, or by any other means) [Mother] except that [Father] may so contact [Mother] in regard to any issue related to the parties' [child] and may attend any and all medical appointments for [child] with [Mother] or any other function to which both parents are invited." The order referenced the parties' custody agreement and held that the consent protective order was to expire May 20, 2020.

On July 3, 2024, Father filed a petition to register the September 6, 2019, Maryland Circuit Court's order and agreement with the Family Court of Monongalia County. By agreement of the parties, the Maryland Circuit Court order and the agreement were registered in the family court by order entered September 16, 2024. Also on July 3, 2024, Father filed a petition to modify the Maryland Circuit Court's September 6, 2019, order in the family court. Specifically, Father sought a 50-50 parenting plan on the basis that both parties now resided in Morgantown, West Virginia.

---

[3] The parties have been separated since the date of the altercation.

On November 22, 2024, and December 6, 2024, the family court held final hearings on Father's petition. By order entered December 10, 2024, the family court denied Father's petition to modify the Maryland Circuit Court's September 6, 2019, order. The family court's twenty-page order made extensive findings of fact and conclusions of law. The order found that Mother and child have resided in Morgantown since the fall of 2019 and explained that the parties lived roughly four driving hours apart when Father lived in Maryland. The family court's order stated that Father then moved from Maryland to Pennsylvania in August of 2021, when the child was two years old, and that the parties lived approximately one hour apart at that time. Father then moved to Morgantown in August of 2023. The family court noted that because Father did not change employers upon his recent relocation and commutes to his Pennsylvania job from his Morgantown residence, Father could have easily chosen to live in Morgantown as early as August of 2021. Relevant to this appeal, the family court found that "[b]y sitting on his right to seek modification for almost three years following his relocation from Maryland, this [c]ourt is inclined to believe he has waived his claim that the [relocation to Morgantown] represents a substantial change in circumstances." The family court also recognized that Father sought no additional parenting time until eleven months after he moved to Morgantown.

The family court concluded there had not been a substantial change in circumstances since the entry of the September 6, 2019, order. However, the court went on to analyze that even if it concluded that there had been a substantial change in circumstances, it had "grave concerns that an expansion of Father's custodial time would be in the child's best interests." The court stated the following:

> In the more than five years since the parties were involved in a relationship, the father repeatedly sought to reconcile with the mother, including repeatedly asking her to go on dates with him. Throughout that time, he has callously used the child as a tool in his pursuit of the mother. He has continually pursued the mother despite her repeated rejections of his overtures and her requests that he stop. His conduct has caused significant stress to the mother and her family. The [c]ourt also is concerned that the father's obsession with the mother has caused stress to the child in that the father appears to regularly talk to the child about how much the father wants the three of them to be a family again.

The family court went on to explain that the parties had submitted over a thousand pages of communications between them over the Talking Parents app and in many of their communications, Father appeared "irrational" and operated "under assumptions that had little, if anything, to do with reality." The family court gave numerous verbatim examples of the parties' conversations that it found concerning and further stated that while it provided those examples, there were "many other times when [F]ather ha[d] done things or said things that [were] cause for concern" that were not provided within the order.

The family court found that Father's "obsession with [M]other continued in 2024, even while th[e] case was pending, and even after [M]other became engaged to her current husband" and that "[F]ather's constant pursuit of a relationship of [M]other for more than five years following their separation [was] mind-boggling." Particularly, the family court found that,

> The father's conduct is disturbing and, frankly, unprecedented in the sixteen years this [c]ourt has sat on the [f]amily [c]ourt bench. The father has been stalking the mother, and this [c]ourt questions whether he will change even given the mother's marriage. What is particularly troubling is the father's use of the child in his pursuit of the mother. What this [c]ourt has wrestled with most is whether, given the evidence, it should impose further restrictions on the father's interaction with the child.

In reviewing the parties' texts, the family court could not find one example of Mother leading Father on or doing anything else that might be interpreted as offering encouragement to Father that they might somehow reconcile. Rather, the court found that Mother repeatedly ignored Father's overtures or explicitly told him there was no chance of them ever getting back together and to leave her alone. The family court also found various situations where Father's behavior was concerning and bolstered its concern whether Father should have a larger role in the child's life, and by extension, Mother's life. The family court determined that after reviewing the messages between the parties, Father ignored Mother's texts when she asked questions about the child and instead, Father withheld "information as a bargaining chip in his efforts to get [M]other to spend time with him."

For example, the family court noted that in 2021, Father did not inform Mother that the child had collapsed from a seizure. Mother was unaware of the incident until the pediatrician's office contacted Mother the following morning to inquire about the child's temperature. The family court found that the subsequent texts between the parties illustrated Mother reaching out to Father for information and Father being evasive about the incident. During those exchanges, Father finally disclosed that the child had a high temperature, and the child was taken to the emergency room. Mother did not know the child suffered from a febrile seizure until days later when she was able to review the medical records from the emergency room visit.

The family court also discussed an incident from 2023 when Father was exercising his one-week parenting time in Ocean City, Maryland and was charged with operating a motor vehicle with an occupant under sixteen that was not restrained by a seat belt. Mother only learned of the incident during the parties' family court proceedings. The court noted that when Father was questioned about it during a hearing, Father was evasive and claimed to not recall the incident or remember the identity of the minor occupant who had been in the vehicle with him.

4

The family court concluded that Father was evasive, less than truthful, and not credible. Whereas it found Mother and her witnesses to be "far more credible" than Father. The family court determined that it would not be in the child's best interest to award Father additional time with the child. In reaching that conclusion, the family court explained that it simply could not ignore Father's conduct over the more than five years preceding its decision and stated that Father's unending pursuit of Mother represented "stalking. . . . and such stalking is particularly egregious because [M]other could never truly get away from [F]ather because of the child."

The family court stated that it was not a coincidence that after more than five years, Father filed his petition to seek an equal 50-50 parenting plan in the same month Mother became engaged to her current husband. The family court suspected that Father regularly "pumped" the child for information about Mother's personal life. The court specifically found that the only thing that had changed since the entry of the September 6, 2019, order was that Father knew Mother was involved in a serious relationship with another man when he filed his July 3, 2024, petition to modify.

The family court went on to explain that Father's actions appeared "delusional and obsessed" and that it had "grave reservations about [F]ather's mental stability" and how Father's actions affected the child. "There is little doubt in this [c]ourt's mind that [F]ather has consistently led the child to believe that [F]ather, [M]other and child can be a family unit. That is profoundly unfair and unfeeling to the child." The court also expressed its concerns with Father's selfish efforts to use the child primarily as a tool in his pursuit of Mother.

The family court concluded that Father should seek an evaluation from a mental health professional before the court would consider expanding Father's parenting time in the future. In rebutting the 50-50 presumption and the extent to which a substantial change of circumstances existed, the family court concluded that the parents had been unable to work cooperatively and collaboratively in the best interests of the child, and that such failure has been purely a function of Father's actions. The court also noted that it could not establish a parenting plan that it found harmful to the child and reasoned that given Father's past actions, there was simply no possible basis that Father should be entrusted with more time with the child at this time. Recognizing that while "not a clearly specified statutory factor" pursuant to West Virginia Code § 48-9-209 (2024), the court also found that "it would be harmful to [M]other were she somehow forced to interact with [F]ather any more than she has to at the present time." With clear reservations, the family court concluded that it would not reduce Father's parenting time.

After considering the child's medical episode during Father's parenting time, Father's driving citation involving a minor not wearing a seat belt, and "[g]iven the past communication issues between the parties and the other problems between the parties noted herein," the family court awarded Mother sole major decision-making responsibility for

the child. However, the court noted that Mother should continue to consult with and inform Father of such decisions. By order entered December 10, 2024, the family court denied Father's petition to modify the parenting plan and determined that its findings and conclusions were in the child's best interests. It is from this order that Father now appeals.

When reviewing the order of a family court, we apply the following standard of review:

> When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate court review of family court orders).

On appeal, Father asserts three assignments of error, which we will address out of order for efficiency and clarity. First, Father argues that the family court abused its discretion by failing to find that a substantial change in circumstances had occurred due to his relocation to Morgantown. In support of his argument, he maintains that because he now lives in the same town as Mother and child, a modification of equal parenting time is warranted. We disagree.

Modifications of parenting plans based on a substantial change in circumstances are governed by West Virginia Code § 48-9-401 (2022), which provides, in part, that:

> (a) [A] court shall modify a parenting plan order if it finds, on the basis of facts that were not known or have arisen since the entry of the prior order and were not anticipated in the prior order, that a substantial change has occurred in the circumstances of the child or of one or both parents and a modification is necessary to serve the best interests of the child.

> (d) For purposes of subsection (a) of this section, the occurrence or worsening of a limiting factor, as defined in § 48-9-209(a) of this code, after a parenting plan has been ordered by the court constitutes a substantial change of circumstances and measures shall be ordered pursuant to § 48-9-209 of this code to protect the child or the child's parent.

As provided for in West Virginia Code § 48-9-209(f)(5)(A), the family court shall consider whether 50-50 parenting time is "[i]mpractical because of the physical distance

between the parents' residences." After a court finds a substantial change in circumstances has occurred, 50-50 custodial allocation is presumed to be in the best interest of the child and shall be awarded unless rebutted by a preponderance of evidence. *See Jesse C. v. Veronica C.*, No. 23-ICA-169, 2024 WL 1590468 (W. Va. Ct. App. Feb. 8, 2024) (memorandum decision) (citation omitted). Here, Father is correct in his assertion that moving to Morgantown to be closer to the child could have constituted a substantial change in circumstances to warrant modifying the existing parenting plan.[4] However, the family court found that the presumption of 50-50 custodial allocation was rebutted because the parents could not work cooperatively and collaboratively in the best interests of the child. *See* W. Va. Code § 48-9-209(f)(6). In support of this finding, the family court stated that it had major concerns regarding Father's actions toward Mother and found that Father's actions were harmful to the child. "'[T]he best interests of the child is the polar star by which decisions must be made which affect children.' *Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 405, 387 S.E.2d 866, 872 (1989)." *Kristopher O. v. Mazzone*, 227 W. Va. 184, 192, 706 S.E.2d 381, 389 (2011). Therefore, we cannot conclude that the family court abused its discretion in finding that expanding Father's parenting time was not in the child's best interest. Additionally, we find no error in the family court's conclusion that the 50-50 presumption was rebutted due to Father's behavior which made the parties unable to work cooperatively and collaboratively in the best interest of the child.

Next, Father argues that the family court abused its discretion by failing to consider that the child's advancement in age constituted a substantial change in circumstances. Upon review, the record fails to establish that Father raised this issue below and Father's brief fails to comply with Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure because his argument does not "contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal." We are mindful that "[w]hen a litigant chooses to represent [themself], it is the duty of the [Court] to insure fairness, allowing reasonable accommodations for the pro se litigant so long as no harm is done an adverse party[.]" *Bego v. Bego*, 177 W. Va. 74, 76, 350 S.E.2d 701, 703 (1986). However, "[t]o preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a [reviewing] court to the nature of the claimed defect." Syl. Pt. 2, *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 470 S.E.2d 162 (1996). "Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered." *Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009).

---

[4] The family court was hesitant to find that a substantial change had occurred due to Father's relocation because Father waited to file his petition to modify until three years after he got a job in Pennsylvania. While it does not change the outcome of our decision in this matter, we note that the family court's determination that Father waived his claim to modify the prior order "[b]y sitting on his right to seek modification for almost three years following his relocation" is neither supported by statute or caselaw.

Because Father failed to illustrate when and how this issue was raised before the family court, and the appendix record fails to establish the same, we decline to consider this assignment of error on appeal.

Lastly, Father argues that the family court abused its discretion when it assigned sole major decision-making responsibility to Mother. Father contends that the court erroneously based its ruling on the parties' inability to work collaboratively and in cooperation with each other. Father maintains that there was no evidence of conflict or disagreements between the parties related to the child's care to support the family court's ruling. We disagree.

Allocation of significant decision-making responsibility is governed by West Virginia Code § 48-9-207 (2022), which provides the following:

> Unless otherwise resolved by agreement of the parents under § 48-9-201 of this code, the court shall allocate responsibility for making significant life decisions on behalf of the child, including the child's education and health care, to one parent or to both parents jointly, in accordance with the child's best interest, in light of the ability or inability of the parents, based upon the evidence before the court, to work collaboratively and in cooperation with each other in decisionmaking on behalf of the child, and the existence of any criteria as set forth in § 48-9-209 of this code.

Here, the family court articulated numerous examples of conflict between the parties and noted that there were "many other" instances that it did not analyze in the order that gave the court "cause for concern." The family court found that the failure of the parties to work collaboratively and in cooperation with each other for the child's decision-making was "purely a function of [F]ather's actions." Importantly, the family court determined that awarding Mother with significant decision-making responsibility was in the child's best interest and concluded that it could not establish a parenting plan that it found harmful to the child. In support of its ruling, the court explained that Father used the child as a tool in his never-ending pursuit of Mother, consistently led the child to falsely believe they could be a family unit, caused the child stress, was delusional, stalked Mother, behaved disturbingly, failed to inform Mother of the child's medical emergencies during his parenting time, failed to inform Mother of his driving citation related to an unrestrained minor during his parenting time, withheld information from Mother as a bargaining chip, and concluded that Father's mental instability gave the court grave reservations about how Father's actions affected the child. As such, the family court properly articulated and analyzed the reasoning behind its ruling.

Given the discretion afforded to a family court, and Father's lack of evidence in support of his contention, we decline to substitute our judgment for that of the family court. *See Amanda A. v. Kevin T.*, 232 W. Va. 237, 245, 751 S.E.2d 757, 765 (2013) ("[A] family

court's decision is entitled to significant deference. Absent an abuse of discretion, this Court must refrain from substituting its judgment for that of the family court, even if this Court might have decided a case differently."). Thus, we cannot conclude that the family court erred or abused its discretion by awarding Mother sole decision-making responsibility on behalf of the child.

Accordingly, we affirm the family court's December 10, 2024, order.

Affirmed.

**ISSUED:** September 30, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge Daniel W. Greear
Judge S. Ryan White